## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.        1:19-cv-02856-RBJ

**UNITED STATES OF AMERICA,**
**ex rel. WILLIAM CUSICK,**
Plaintiff,

v.

**JOHN DAVID KUTZKO,**
**LINDA WINGATE KUTZKO,**
**TOBY DAVID LIROT,**
**CASEY DEE LIROT,**
**PAGOSA P& C, INC., a Colorado corporation,**
**TODD HENRY ANTROBUS,**
**WANDA LUCILLE ANTROBUS,**
**BRIAN KEITH HICKS,**
**PAGOSA SPRINGS PHARMACY LLC, a Colorado limited liability company,**
**NHS PHARMA SALES, INC., a California corporation,**
**NHS PHARMA, INC., a California corporation,**
**CHARLES RONALD GREEN, JR.,**
**MELINDA ELIZABETH GREEN,**
**DAVID PALMER TENNEY, and**
**DONALD E. JONES, Jr.**
Defendants.

---

## AMENDED *QUI TAM* COMPLAINT AND JURY DEMAND

---

The Relator, William Cusick, by and through his counsel, acting as a Relator on behalf of the Government of the United States of America, states the following amended Complaint against the defendants:

### I.        INTRODUCTION

1.        This lawsuit is brought pursuant to the provisions of the False Claim Act ["FCA"], 31 U.S.C. § 3729, *et. seq.*, to recover monies which the United States overpaid because of the actions of the defendants.

2.      This *qui tam* suit arises out of illegal schemes by defendants to knowingly submit, or cause to be submitted, claims to the Medicare, Tricare, Medicaid and other federal government health care programs for prescriptions for drugs that were tainted by illegal kickbacks, were derived from phony prescriber-patient relationships, represented illegal attempts to overcharge these government health care programs for a given drug and/or were otherwise false and fraudulent.

3.      The principal events at issue transpired in the time period of August of 2014 to the present and are ongoing.

## II.      PARTIES

4.      Relator William Cusick ("Cusick") is a resident of Pagosa Spring, Colorado.

5.      The Defendant John David Kutzko is an adult resident of Pagosa Springs, Colorado.

6.      The Defendant Linda Wingate Kutzko is an adult resident of Pagosa Springs, Colorado.

7.      The Defendant Toby David Lirot is an adult resident of Lakewood, Washington or Punta Gorda, FL.

8.      The Defendant Casey Dee Lirot is an adult resident of Lakewood, Washington or Punta Gorda, FL.

9.      The Defendant Pagosa P & C, Inc. ("PP&C") is a delinquent Colorado corporation.  From approximately November 9, 2015 until February of 2019, Pagosa P & C was the corporate entity used to operate the pharmacy located at 426 Pagosa Street, Pagosa Springs Colorado under the tradename "Pagosa Specialty Pharmacy."

10.      The Defendant Todd Henry Antrobus is an adult resident of Olive Hill Kentucky.

11.     The Defendant Wanda Lucille Antrobus is an adult resident of Olive Hill Kentucky.

12.     The Defendant Brian Keith Hicks is an adult resident of Stevenson, AL.

13.     The Defendant Pagosa Springs Pharmacy LLC is a Colorado limited liability company.  From approximately January 17, 2017 until February of 2019, Pagosa Springs Pharmacy LLC owned 100% of the stock of Pagosa P & C and was used to operate the pharmacy located at 426 Pagosa Street known as Pagosa Specialty Pharmacy.

14.     The Defendant NHS Pharma Sales, Inc. is a California corporation that maintains its principal place of business at 508 W. Mission Avenue, Suite 202, Escondido, CA 92025.

15.     The Defendant NHS Pharma, Inc. is a California corporation that maintains its principal place of business at 508 W. Mission Avenue, Suite 202, Escondido, CA 92025.

16.     The Defendant Charles Ronald Green, Jr. a/k/a Ron Green is an adult resident of Florida and one of the individuals responsible for the acts and omissions of NHS Pharma Sales, Inc. and NHS Pharma, Inc.

17.     The Defendant Melinda Elizabeth Green is an adult resident of Florida and one of the individuals responsible for the acts and omissions of NHS Pharma Sales, Inc. and NHS Pharma, Inc.

18.     The Defendant David Palmer Tenney is an adult California resident and one of the individuals responsible for the acts and omissions of NHS Pharma Sales, Inc. and NHS Pharma, Inc.

19.     The Defendant Donald E. Jones, Jr. is an adult Florida resident who maintains his residence at 21751 Mims Way, Lutz FL 33549.

### III. JURISDICTION AND VENUE

20.     This action is brought on behalf of the United States Government under 31 U.S.C.

§ 3729, *et seq.*, the FCA.  Cusick brings this action under 31 U.S.C. § 3730(b) to recover for

"false claims" which the defendants knowingly presented or caused to be presented to the

Government and/or concealed or caused to be concealed from the Government in violation of 31

U.S.C. § 3729(1)(A)-(C), (G) as amended May 20, 2009. This Court has jurisdiction over such

claims pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730.

21.     *In personam* jurisdiction is appropriate in this district because the FCA provides

for nationwide service of process. 31 U.S.C. § 3732(a).  In such circumstances, the relevant

inquiry is whether a given defendant has sufficient contacts with the United States as a whole.

*Appl. To Enforce Admin. Subp. of  S.E.C. v. Knowles*, 87 F.3d 413, 417-419 (10th Cir. 1996).

The defendants have significant presence in Colorado and have abundant national contacts.

22.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the

defendants can be found or transact business in this district and/or because one or more of the

acts proscribed by the False Claims Act occurred within this district.

### IV. THE FALSE CLAIMS ACT

23.     The False Claims Act ("FCA") is the federal government's primary tool to

recover losses due to fraud and abuse by those seeking payment from the United States.  See S.

Rep. No. 345, 99 Cong., 2nd Sess. at 2 (1986) reprinted in 1986 U.S.C.C.A.N 5266.

24.     The FCA was originally enacted in 1863, and was substantially amended in 1986

by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153 and in 2009, and 2010, to

enhance the ability of the Government to recover losses it sustained as the result of its payment

of false claims.

25.     The FCA provides in pertinent part that any person who:

(A) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or]

(C) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;

is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person. See also 28 C.F.R. § 85.3(a)(9) (setting forth the current civil penalties level of not less than $5,500 and not more than $11,000 for violations of the FCA).  For violations occurring on or after November 2, 2015, the civil penalty amounts range from a minimum of $11,181 to a maximum of $22,363. 28 C.F.R. § 85.5.

26.     The terms "knowing" and "knowingly," which comprise the FCA's scienter requirement, are defined at 31 U.S.C. § 3729(b)(1)(A) to mean a person who, with respect to relevant information:

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information.

No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

27.     The FCA also broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—(i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

28.     The FCA empowers private persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery.

29.     The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

30.     The knowing request of federal reimbursement for the provision of medical services that fail to meet the criteria set forth in federal statutes and regulations constitutes a violation of the FCA. In this action, the defendants knowingly and routinely falsely charged, or caused to be falsely charged, multiple government healthcare programs for prescription drugs.

## V.      GOVERNMENT HEALTHCARE PROGRAMS

31.      As sued in this Amended Complaint, government healthcare programs or GHPs

refers to healthcare programs paid for, in whole or in part, by federal funds.  They include:

### A.   Medicare:

32.      In 1965, Congress enacted Title XVIII of the Social Security Act, known as the

Medicare program, to pay for the costs of certain healthcare services. Entitlement to Medicare is

based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426A.

Medicare is a 100% federally subsidized health insurance system.

33.      The Department of Health and Human Services ("HHS") is responsible for the

administration and supervision of the Medicare program. The Centers for Medicare and

Medicaid Services (CMS) is part of HHS and is directly responsible for the administration of the

Medicare program.

34.      CMS' payment and audit functions under the Medicare program are contracted

out to insurance companies known as Medicare Administrative Contractors ("MAC's").  MAC's

determine payment amounts due the providers under Medicare law and under interpretive

guidelines published by CMS.  See, 42 U.S.C. §1395h, 42 C.F.R. §§413.20(b) and 413.24(b).

35.      Entitlement to Medicare is based on age, disability, or affliction with end-stage

renal disease. 42 U.S.C. §§ 426, 426-1, 426A. Individuals who are insured under Medicare are

referred to as Medicare "beneficiaries."

36.      The Medicare program consists of four parts: A, B, C, and D. Part D provides

prescription drug coverage. S*ee* 42 U.S.C. § 1395w-101, et seq.; 42 C.F.R. § 423.1, et seq. Part

D prescription drug plans are administered by private insurance companies approved by the

federal government and receive contributions from the federal treasury. 42 U.S.C. § 1395w-101, et seq.

**B.   The Medicare Part D Program**

37.     In 2003, Congress passed the Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. 108-173, 117 Stat. 2066, which established a voluntary prescription drug benefit program for Medicare enrollees known as Medicare Part D. An individual is eligible to enroll in Part D if the individual lives in the service area of the Part D plan and is entitled to Medicare benefits under Part A or enrolled under Part B. 42 U.S.C. § 1395w-101(a)(3)(A); 42 C.F.R. § 423.30(a).

38.      Medicare Part D coverage is not provided within the traditional Medicare program. Medicare Part D is based on a private market model. Medicare contracts with private entities known as Part D Plan "Sponsors" to administer prescription drug plans.

39.     A Part D Plan Sponsor may be either a prescription drug plan, a Medicare Advantage organization that offers a Medicare Advantage prescription drug plan, a Program of All-inclusive Care for the Elderly ("PACE") organization offering a PACE plan including qualified prescription drug coverage, or a cost plan offering qualified prescription drug coverage. 42 C.F.R. § 423.4.

40.     Medicare beneficiaries who wish to receive Part D benefits must enroll in a Part D Plan offered by a Part D Plan Sponsor. The Part D Sponsors are regulated and subsidized by CMS pursuant to one-year, annually renewable contracts. Part D Sponsors, in turn, enter into subcontracts with pharmacies or other downstream entities to provide prescription drugs to the Medicare Part D beneficiaries enrolled in their plans.

41.     Generally, after a physician writes a prescription for a Medicare Part D beneficiary, that patient can take the prescription to a pharmacy (or submit it to a mail order specialty pharmacy) to be filled.

42.     When a pharmacy dispenses a drug to a Medicare beneficiary, it submits an electronic claim to the beneficiary's Part D Plan Sponsor (sometimes through a pharmacy benefit manager ("PBM")) and receives reimbursement from the Part D Plan Sponsor (or the PBM) for the portion of the drug cost not paid by the Part D beneficiary.

43.     In order to be eligible to submit claims to a Part D Plan Sponsor, a pharmacy must complete CMS Form 855S.  Among the many requirements of this form, the pharmacy applicant must certify:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 1B of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) (section 1128B(b) of the Social security Act) and the Physician Self-Referral Law (Stark Law), 42 U.S.C. section 1395nn (section 1877 of the Social Security Act)).

44.     The Part D Plan Sponsor notifies CMS that a drug has been purchased and dispensed through a document called a Prescription Drug Event ("PDE") record, which includes data elements about the drug dispensed, the prescription, and the payment to the pharmacy.

45.      Each PDE that is submitted to CMS is a summary record that documents the final adjudication of a dispensing event based upon claims received from pharmacies and serves as the request for payment for each individual prescription submitted to Medicare under the Part D program. The data contained in PDEs are data related to payment of claims. The Integrated Data

Repository process date is the date when the PDE is transmitted to CMS, such that CMS is informed of the PDE by the Part D Plan Sponsor.

46.     Submitting PDE claims data to CMS, which is necessary for CMS to administer the Part D program and make payments to Part D Plan Sponsors for qualified drug coverage, is a material condition of payment for CMS's provision of Medicare funds to Part D Plan Sponsors. *See* 42 C.F.R. § 423.322.

47.     In order to receive Part D funds from CMS, Part D Plan Sponsors, their authorized agents, employees, and contractors are required to comply with all applicable federal laws and regulations, as well as CMS instructions. By statute, all contracts between a Part D Plan Sponsor and HHS must include a provision whereby the Part D Plan Sponsor agrees to comply with the applicable requirements and standards of the Part D program, as well as the terms and conditions of payment governing the Part D program. 42 U.S.C. § 1395w-112.

48.     Further, CMS regulations expressly require Part D Plan Sponsors to certify, in their contracts with CMS, that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse, including the False Claims Act and the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b). *See* 42 C.F.R. § 423.505(h)(1).

49.     CMS regulations require that all subcontracts between Part D Plan Sponsors and downstream entities, including pharmacies, contain language obligating the dispensing pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. § 423.505(i)(4)(iv).

50.     Medicare Part D only pays for drugs that are used for a medically accepted indication, which means a use that is approved under the Food, Drug, and Cosmetic Act, or a use which is supported by one or more citations included or approved for inclusion in one of the

specified compendia. 42 U.S.C. § 1395w-102(e)(1) & (e)(4); 42 U.S.C. § 1396r-8(g)(1)(B)(i)& (k)(6); 42 C.F.R. § 423.100.

51.     Medicare Part D only pays for drugs that are dispensed upon a valid prescription. 42 U.S.C. § 1395w-102(e); 42 C.F.R. § 423.100. A "Part D sponsor may only provide benefits for Part D drugs that require a prescription if those drugs are dispensed upon a valid prescription." 42 C.F.R. § 423.104(h). A valid prescription must comply "with all applicable State law requirements constituting a valid prescription." 42 C.F.R. § 423.100.

52.     Moreover, prescriptions for controlled substances that are not issued for a legitimate medical purpose, such as recreational use, are not for "medically accepted indications" and are therefore not covered Medicare Part D drugs. 42 USCA § 1395w-102(e)(1); 42 C.F.R. § 423.100.

53.     All prescriptions for controlled substances are required to be dated as of, and signed on, the day when issued and to bear the full name and address of the patient; the drug name; strength; dosage form; quantity prescribed; directions for use; and the name, address, and registration number of the practitioner. 21 C.F.R. § 1306.05(a).

54.     Part D plans may also exclude drugs from payment if the drugs are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve functioning of a malformed body part. 42 U.S.C. § 1395w-102(e)(3) (incorporating by reference 42 U.S.C. § 1395y(a)).

   **C.  <u>Medicaid:</u>**

55.     The Medicaid program was also created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income, blind, or disabled persons, or to members of families with dependent children or qualified pregnant

women or children. The Medicaid program is jointly financed by the federal and state governments.

56.     CMS administers Medicaid on the federal level. Within broad federal rules, each state determines eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The states directly pay providers, with the states obtaining the federal share of the payment from accounts that draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.30 (1994). The federal share of Medicaid expenditures varies by state and can fluctuate annually.

57.     Federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of the United States Department of Health and Human Services ("the Secretary").

58.     After the Secretary approves the plan submitted by the State, the state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan. 42 U.S.C. § 1396b(a)(1). This reimbursement is called "federal financial participation" ("FFP").

59.     Each state provides its Medicaid beneficiaries with a prescription drug benefit. The pharmacy reimbursement rate varies by state, but it is generally computed by determining the pharmacy's estimated acquisition cost for the dispensed drug plus a reasonable dispensing fee.

   **D.  The TRICARE Program**

60.     TRICARE is a medical benefits program established by federal law. 10 U.S.C. § 1071-1110b.

61.     Formerly known as CHAMPUS, TRICARE is administered by the Defense Health Agency ("DHA"), a component of the Department of Defense ("DOD"). TRICARE provides health care benefits to eligible beneficiaries, who include, among others, active duty military personnel, retired service members, and military dependents.

62.     TRICARE is a "health care benefit program" as defined by 18 U.S.C. § 24(b), that affects commerce, and as that term is used in 18 U.S.C. § 1347. 3.

63.     TRICARE is a "Federal health care program" as defined by 42 U.S.C. § 1320a-7b(f), that affects commerce, and as that term is used in 42 U.S.C. § 1320a-7b(b).

64.     TRICARE provides coverage for certain prescription drugs, including certain compounded drugs, which are medically necessary and prescribed by a licensed physician.

65.     The DHA administers the TRICARE pharmacy benefits program. This program offers pharmacy services to eligible beneficiaries through direct care pharmacies located at Military Treatment Facilities and through the TRICARE retail and mail order pharmacy service contract(s).

66.     At all times material hereto, Express Scripts, Inc. ("ESI") has been the TRICARE retail and mail order pharmacy services contractor for all TRICARE beneficiaries located in the 50 States, the District of Columbia, Puerto Rico, the U.S. Virgin Islands and Guam.

67.     ESI functions as a Pharmacy Benefit Manager to provide mail order pharmacy services and a retail pharmacy network.

68.     ESI also serves as a fiscal intermediary on behalf of the Department of Defense, processing and paying claims for all authorized pharmaceuticals and supplies dispensed to beneficiaries. The contract between TRICARE and ESI specifically provides that ESI pays for TRICARE prescriptions with government funds, and that the government acquires the covered

drugs for the use of the federal government in support of the TRICARE contract. The contract between TRICARE and ESI incorporates the TRICARE Reimbursement Manual.

69.     At all relevant times, TRICARE beneficiaries were responsible for sharing the costs of drug prescriptions filled by a retail or mail-order pharmacy by paying a copayment. 10 U.S.C. § 1074g(a)(6); TRICARE Reimbursement Manual, Chapter 2, Addendum B.

70.      A pharmacy seeking reimbursement from TRICARE must comply with TRICARE's anti-fraud and abuse provisions. 32 C.F.R. § 199.9(a)(4). Fraudulent situations include commission and kickback arrangements. *Id.* § 199.9(c)(12). Abusive situations include the routine waiver of patient copayments. *Id.* § 199.9(b)(1).

71.     TRICARE regulations specify that "[a]ll fraud, abuse, and conflict of interest requirements [in section 199.9] are applicable to the TRICARE pharmacy benefits program." 32C.F.R. § 199.21(p). TRICARE's contract with ESI also incorporates the provisions of 32 C.F.R. § 199.

72.     To avoid abuse situations, providers are obligated to provide services and supplies under TRICARE that are: "Furnished at the appropriate level and only when and to the extent medically necessary . . .; of a quality that meets professionally recognized standards of health care; and, supported by adequate medical documentation as may reasonably be required under this part . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care." *Id.*

73.     The TRICARE regulations, in turn, define "appropriate" medical care as that which is, *inter alia*, "[f]urnished economically"—i.e., "in the least expensive level of care or medical environment adequate to provide the required medical care." 32 C.F.R. § 199.2.

74.     Fraud or abuse by a pharmacy may result in the denial of the pharmacy's claims or the exclusion or suspension of the pharmacy from participation in the TRICARE program. 32 C.F.R. § 199.9(b), (f).

75.     To receive reimbursement from TRICARE, a pharmacy must enter into a Provider Agreement with ESI, TRICARE's pharmacy benefits manager. A Provider Agreement is essential to TRICARE's claims submission.

76.     Having a valid Provider Agreement was required in order to submit claims for drug reimbursement to TRICARE. Pagosa Specialty Pharmacy submitted such a Provider Agreement to ESI and used it to obtain reimbursement from TRICARE for compounded drugs at all times material hereto.

77.     The defendants executed one or more provider agreements with ESI in which they agreed to:

> a. "be bound by and comply with the provisions of this Agreement and all applicable laws, rules and regulations including, but not limited to, fraud waste and abuse laws …."
>
> b. "not submit a claim to ESI until it has preliminarily determined … that the prescription presented is valid and issued in accordance with applicable laws, rules and regulations."

78.     In the Provider Agreement(s) between ESI and the defendants, ESI expressly reserved the right to reverse any claim that these pharmacies submitted for a prescription if they "failed to … verify that the prescription was issued in accordance with applicable laws, rules and regulations."

79.     In addition, the defendants agreed in their Provider Agreement(s) with ESI to comply with ESI's Provider Manual.

80.     The ESI Provider Manuals in effect at all times material hereto also required the defendants to be aware of and comply with all state and federal law, "including anti-kickback statutes and self-referral statutes." The Manuals warned that "[f]ailure to demonstrate compliance with these laws may result in immediate termination by [ESI]."

81.     In addition, TRICARE covers pharmacy services but requires that "pharmacies [] meet the applicable requirements of state law in the state in which the pharmacy is located." 32 C.F.R. § 199.6(d)(3); *see also* TRICARE Policy Manual 6010.57-M, Ch. 8, Sec. 9.1 (Feb. 1, 2008 and April 1, 2015).

82.     Under Colorado law, a pharmacy may lose its license to dispense drugs if it dispenses a drug based on a prescription that a pharmacist knows or has reason to believe is not based on a valid patient-prescriber relationship. Specifically, 3 CCR § 719-1:3.00.21 provides:

> **A pharmacist shall make every reasonable effort to ensure that any order, regardless of the means of transmission, has been issued for a legitimate medical purpose by an authorized practitioner. A pharmacist shall not dispense a prescription drug if the pharmacist knows or should know that the order for such drug was issued without a valid preexisting patient-practitioner relationship. Such relationship need not involve an in-person encounter between the patient and practitioner if otherwise permissible under Colorado law.**

83.     TRICARE's regulations also prohibit fraudulent and abusive billing relationships, defined as "incidents and practices which may directly or indirectly cause financial loss to the Government." 32 C.F.R. § 199.9(b). One of the prohibited types of abuse set forth in the regulation is "charging [TRICARE] beneficiaries rates for services and supplies that are in excess of those charges routinely charged by the provider to the general public." *Id.* § 199.9(b)(2).

E. **Other Federal Government Healthcare Programs**

84.     The Federal Government administers other healthcare programs including, but not limited to CHAMPVA, the federal workers compensation program, Indian Health Services, and The Federal Employee Health Benefit program.

85.     CHAMPVA administered by the United States Department of Veterans Affairs is a healthcare program for families of veterans with 100 percent service-connected disability. 31 U.S.C. §§ 1781 *et seq.*; 38 C.F.R. § 17.270(a)

## VI.     THE ANTI-KICKBACK STATUTE ("AKS")

86.     The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), arose out of Congressional concerns that inducements may corrupt patient and professional health care decision-making, impose higher costs on federal health care programs, and divert federal funds towards goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the federal health care programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form.

87.     First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. See Social Security Amendments of 1972, Pub.L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-Fraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

88.     The AKS prohibits any person or entity from knowingly and willfully offering, paying, soliciting, or receiving any remuneration, directly or indirectly, to induce or reward a person for, *inter alia*, purchasing, ordering, arranging for, or recommending the purchase or

17

ordering of any goods or services for which payment may be made, in whole or in part, under a

federal health care program. 42 U.S.C. § 1320a-7b(b)(1), (2).

89.     A federal health care program is defined, in part, as "any plan or program that

provides health benefits, whether directly, through insurance, or otherwise, which is funded

directly, in whole or in part, by the United States Government[.]" 42 US.C. § 1320a-7b(f).  As

such, the AKS applies to all GHPs, including Medicare, Medicaid and Tricare.

90.     In relevant part, 42 U.S.C. § 1320a-7b(b) of the AKS provides:

(b) Illegal remunerations:

(1) whoever knowingly and willfully solicits or receives any remuneration (including any

kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind —

> (A) in return for referring an individual to a person for the furnishing or arranging
>
> for the furnishing of any item or service for which payment may be made in
>
> whole or in part under a Federal health care program, or
>
> (B) in return for purchasing, leasing, ordering or arranging for or recommending
>
> purchasing, leasing or ordering any good, facility, service, or item for which
>
> payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than

$100,000 or imprisoned for not more than ten years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any

kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to

any person to induce such person

(A) to refer an individual to a person for the furnishing or arranging for the

furnishing of any item or service for which payment may be made in whole or in

part under a Federal health care program, or

(B) to purchase, lease, order or arrange for or recommend purchasing, leasing or

ordering any good, facility, service, or item for which payment may be made in

whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than

$100,000 or imprisoned for not more than ten years, or both.

91.     The AKS "seeks to ensure that referrals will be based on sound medical judgment and that providers will compete for business based on quality and convenience, instead of paying for ... [referrals]." OIG Advisory Op., No. 98-16 (Nov. 3, 1998). The AKS is intended to prevent arrangements that can lead to the distortion of medical decision-making, overutilization of services and supplies, increased costs to Federal health care programs, and unfair competition. *See* 65 Fed. Reg. 59,434, 59,440 (Oct. 5, 2000).

92.     A claim for reimbursement from a federal health care program for items or services resulting from a violation of the AKS "constitutes a false or fraudulent claim" under the FCA. 42 U.S.C. § 1320a-7b(g).

93.     In March 2010, Congress amended the AKS to clarify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act of 2010, Pub.L. No. 111–148, 124 Stat. 119, codified at 42 U.S.C.§ 1320a–7b(g).

94.     This amendment to the AKS clarifies "that all claims resulting from illegal kickbacks are considered false claims for purpose of civil action under the False Claims Act."

155 Cong.Rec. S10854 (statement of Sen. Leahy). *See also, e.g.*, *United States ex rel. Lutz v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 498 n.2 (D.S.C. 2016) ("[T]his Court finds that the weight of authority supports the conclusion that the 2010 amendment adding 42 U.S.C. 1320a-7b(g) was merely a clarification of the law; claims tainted by AKS violations constitute false claims for the purposes of the FCA regardless of whether the violation occurred before or after the 2010 amendment.") (appeal pending post-judgment).

95.     Under this provision, claims submitted to federal health care programs that result from violations of the AKS are *per se* false or fraudulent within the meaning of 31 U.S.C. § 3729(a)(1)(A)-(B). Accordingly, a person violates the FCA when he or she knowingly submits, or causes to be submitted, claims to federal health care programs that result from violations of the AKS.

96.     Specific intent is not required to establish a violation of the AKS. *See* 42 U.S.C. § 1320a-7b(h) ("With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.").

97.     Furthermore, a violation of the AKS establishes the materiality element of an FCA claim.  There is no contestable issue of materiality with regard to an AKS-based claim.  All claims resulting from AKS violations are "false or fraudulent" as a matter of law. *United States ex rel. McFarland v. Fla. Pharmacy Sols.*, 358 F.Supp.3d 1316, 1326 (m.d. Fla. 2017); *United States ex rel. Lutz v. BlueWave Healthcare Consultants, Inc.,* 853 F.3d 131, 135 (4th Cir. 2017); United States ex rel. Goodman v. Arriva Med., 471 F.Supp.3d 830, 842 (M.D. Tenn. 2020).

98.     For purposes of the AKS, the term "remuneration" includes the transfer of anything of value, "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1320a-7b(b)(1). 56 Fed.Reg. at 35958 ("Congress's intent in placing the term 'remuneration' in

the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever.").

99.     Compliance with the AKS is a condition of payment by the Medicare and Medicaid programs, and payments by the Tricare program must also comply with the AKS.

100.     In addition, violation of the statute can subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, to civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

101.     A violation of the AKS makes a subsequent claim for payment by the Medicare, Medicaid or Tricare programs "false" under the FCA, with no need to subtract the fair market value of the claimed services when calculating damages.

102.     The AKS contains several exceptions in which the prohibitions against providing compensation in exchange for referrals or orders do not apply. The "bona fide employment" exception provides that "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services" will not violate the AKS. 42 U.S.C. § 1320a-7b(b)(3)(B); 42 C.F.R. § 1001.952(i).

103.     This type of compensation to bona fide employees is exempt from the statute's prohibitions because the control that employers exercise over bona fide employees reduces the potential for abuse. *See* Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952 (July 29, 1991).

104.     The Office of Inspector General for the Department of Health and Human Services ("HHS-OIG") has published safe harbor regulations defining arrangements that are not prohibited by the AKS because the practice would be unlikely to result in fraud or abuse. Safe

harbor protection is afforded only to those arrangements that precisely meet all of the conditions set forth in the safe harbor and is an affirmative defense to an alleged AKS violation.

105.    According to the safe harbor regulation, the term "employee has the same meaning" as the Internal Revenue Code's definition of "employee," found in 26 U.S.C. § 3121(d)(2). 42 C.F.R. § 1001.952(i). The Internal Revenue Code provides, in relevant part, that an "employee" is "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." 26 U.S.C. § 3121(d)(2).

106.    As set forth in more detail below, Defendants knowingly and willfully paid remuneration to marketers to obtain referrals for drugs reimbursed by GHPs. At no time did defendants have a bona fide employment relationship with the marketers to whom they paid such remuneration.

107.    By providing kickbacks to induce prescriptions for drugs reimbursed by GHPs, defendants knowingly presented, or caused to be presented, false or fraudulent claims to the GHPs.

## VII.  THE DEFENDANTS' DUTY TO UNDERSTAND THE LAW

108.    Those who deal with the federal government, and in particular, those who seek compensation from the federal government, must use due care to ensure that when they request payment from the government they are legally entitled to receive that compensation. Every person who deals with the federal government is presumed to know the law.  *See, e.g., Cheek v. United States*, 498 U.S. 192, 199, 111 S. Ct. 604, 609, 112 L. Ed. 2d 617 (1991); *United States v. International Minerals & Chemical Corp.*, 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971); *United States v. Aquino-Chacon*, 109 F.3d 936, 938 (4th Cir. 1997).

109.     Failure to adequately familiarize oneself with the legal requirements for government compensation is evidence of reckless disregard. *See United States v. Mackby,* 261 F.3d 821, 828 (9th Cir. 2001). This is of particular concern when an individual or entity files a considerable number of claims with the federal government. *Id.* (noting that twenty percent of the patients at the institution in question were funded by Medicare).

110.     Furthermore, when an individual or entity is confused by the legal requirements of a regulation, it has "some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek." *United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008). The unique circumstances of each case dictate the extent of the duty to inquire. *Id.*

## VIII.   THE IMPROPER CONDUCT OF THE DEFENDANTS

111.     The allegations of the defendants' improper conduct are based on the direct and independent knowledge of Relator Cusick.

112.     Relator Cusick is a licensed pharmacist who worked part time for the Pagosa Specialty Pharmacy from July of 2016 until January of 2019.

113.     While the defendants employed Cusick for filling conventional retail prescriptions, as opposed to filling the scripts that are the subject matter of this suit, during the course of his part time employment, Cusick developed a relationship with two of the primary defendants, John Kutzko and Toby Lirot.

114.     Cusick also observed the day to day work environment of the individuals who engaged in the fraudulent schemes that are described below.

115.     Cusick did not appreciate any wrongdoing by the defendants until approximately 2018.  At that time, two significant events occurred.

116.     In June of 2017, Cusick bought the assets of one of Toby Lirot's corporations, Lirot, Inc.  The primary asset of this corporation was a pharmacy, Mill Street Drug.  Mill Street Drug was a conventional pharmacy that was not involved with the fraudulent schemes described below.

117.     Mill Street Drug was moved by Lirot, Inc. from 15 East Mill Street, Bayfield, Colorado to 871 CR 501 Bayfield Colorado shortly before the asset sale was concluded.

118.     Once the sale of Lirot, Inc.'s assets was completed, Cusick operated this pharmacy as Bayfield Pharmacy.

119.     In approximately April of 2018, Relator Cusick was approached by John Kutzko and other defendants about employing the Bayfield Pharmacy to participate in one or more of the schemes described below.  Relator Cusick learned substantial information during the course of evaluating defendants' overtures.

120.     As part of the Lirot, Inc. asset sale, Cusick acquired one of Toby Lirot's computers.  Cusick eventually began exploring the information that had been left on this computer, including documents Toby Lirot had moved to the computer's recycle bin, but had not deleted from this recycle bin.  As it turns out there were substantial incriminating documents remaining on this computer that Cusick discovered and evaluated.

A.  **The ownership and control history of Pagosa Specialty Pharmacy:**

121.     Relator Cusick's knowledge about the defendants' schemes originates from the operations of the pharmacy located at 426 Pagosa Street, Pagosa Springs, CO 81147.

122.     At all times material hereto, the pharmacy located at 426 Pagosa Street, Pagosa Springs, CO generally operated under the name "Pagosa Specialty Pharmacy."

123.    In approximately August 2014 the ownership of the pharmacy located at 426 Pagosa Street, Pagosa Springs Colorado changed when it was sold by its then owners, Toby Lirot and Casey Lirot, to a group of Florida investors headed by John Kutzko and Linda Kutzko.

124.    In approximately May of 2014, the Kutzkos and the other Florida investors participated in the formation of a Florida corporation known as Petra Pharmacy Services, Inc. ("Petra").  John Kutzko was named as Petra's president in its articles of incorporation.

125.    The approximate August 2014 sale of the pharmacy located at 426 Pagosa Street, Pagosa Springs Colorado by the Lirots was to Petra. Part of the sale price was carried by a promissory note dated 8-11-14 in the amount of $300,000.00 from Petra to the Lirots' corporation, Pagosa P&C, Inc. ("PP&C").

126.    On August 12, 2014, Petra filed a Statement of Foreign Authority with the Colorado Secretary of State identifying that Petra was operating the pharmacy located at 426 Pagosa Street, Pagosa Springs Colorado under the name "Pagosa Specialty Pharmacy."

127.    After the sale of this pharmacy by the Lirots to Petra, John Kutzko and Linda Kutzko were primarily responsible for the day to day operation of Pagosa Specialty Pharmacy.

128.    Financially, things did not work well for Petra.  Petra found itself in a significant, negative cash flow position.

129.    John Kutzko and Petra began borrowing money from Toby Lirot and his corporation, PP&C. Under one loan agreement, John Kutzko and Petra borrowed $35,000.00 on July 1, 2015.

130.    John Kutzko and Petra ran into default on their loan agreements with Toby Lirot and PP&C.

131.     On November 9, 2015, Petra sold the assets of Pagosa Specialty Pharmacy to PP&C, primarily in exchange for PP&C forgiving the 8-11-14 promissory note with Petra then carrying an amount due of $296,928.65.

132.     After the November 9, 2015 asset sale of Pagosa Specialty Pharmacy to PP&C, and lasting until January 17, 2017, Toby and Casey Lirot, John and Linda Kutzko and Don Jones were primarily responsible for the day to day operation of Pagosa Specialty Pharmacy.

133.     From November 9, 2015 until approximately January of 2017, PP&C served as the alter ego of those individuals and entities responsible for its operation, including Toby Lirot, Casey Lirot, John Kutzko, Linda Kutzko, Don Jones, Todd Antrobus and Brian Hicks. Specifically, PP&C was used by these individuals and entities as an instrumentality to perpetuate a fraud and its separate corporate existence should be pierced to prevent fraud or injustice.

134.     In addition, PP&C's separate corporate existence should be ignored as it is currently a delinquent Colorado corporation.

135.     In addition, these individuals, Toby Lirot, Casey Lirot, John Kutzko, Don Jones, Todd Antrobus and Brian Hicks, are not entitled to immunity by hiding behind the corporate structure of any corporate entities, including PP&C because they each actively participated in the wrongs complained of herein by direct involvement which includes conceiving or authorizing the wrongs or by active participation such as specific direction or sanctioning the conduct.

136.     Once again, notwithstanding aggressive efforts by the Lirots, the Kutzkos and Don Jones to establish multiple illegal marketing schemes, in late September of 2016, the Lirots began working out the details of a sale of PP&C, including the Pagosa Specialty Pharmacy operation, to a group of Kentucky investors headed by Todd Antrobus.

137.    On September 21, 2016, Brian Hicks, Todd Antrobus, John Kutzko and Toby Lirot reached a preliminary agreement to sell 60% of the Pagosa Specialty Pharmacy to Brian Hicks and Todd Antrobus for $435,000.00, with Brian Hicks putting up $225,000 in cash and Todd Antrobus signing a promissory note in the amount of $210,000.

138.    Part of this deal provided that Brian Hicks and Todd Antrobus would take over operation of Pagosa Specialty Pharmacy effective October 1, 2016 and that John Kutzko and Linda Kutzko would remain active in the day to day operation of Pagosa Specialty Pharmacy, with Linda Kutzko remaining as the Pharmacist In Charge. So, from October 1, 2016 until the asset sale in January of 2017, Brian Hicks and Todd Antrobus were also responsible for the day to day operation of Pagosa Specialty Pharmacy.

139.    The September 21, 2016 deal changed between September 21, 2016 and January 17, 2017.

140.    By January 17, 2017, Brian Hicks and Todd Antrobus formed a new Colorado limited liability company known as Pagosa Springs Pharmacy LLC ("PagSprPharmLLC"). Brian Hicks and Todd Antrobus were both managing members of PagSprPharmLLC.

141.    In a deal initially signed by Todd Antrobus, Casey Lirot and Toby Lirot on January 2, 2017, and then by Brian Hicks on January 17, 2017, the Lirots sold to PagSprPharmLLC 100% of their stock in PP&C for a total purchase price of $725,000, paid by $370,000 in cash and $355,000 pursuant to a promissory note signed by Brian Hicks and Todd Antrobus, both as managing members of PagSprPharmLLC and individually as guarantors.

142.    Since January of 2017 and continuing until approximately February of 2019, PagSprPharmLLC continuously operated Pagosa Specialty Pharmacy, with Brian Hicks, Todd

Antrobus and his wife, Wanda Antrobus, and Don Jones, exerting primary control over its day to day operation.

143.    From approximately January of 2017 until approximately February of 2019, PagSprPharmLLC served as the alter ego of those individuals and entities responsible for its operation, including Todd Antrobus, Wanda Antrobus, Brian Hicks and Don Jones.  Specifically, PagSprPharmLLC was used by these individuals and entities as an instrumentality to perpetuate a fraud and its separate corporate existence should be pierced to prevent fraud or injustice.

144.    In addition, whether or not the corporate existence of PagSprPharmLLC is disregarded these individuals, Todd Antrobus, Wanda Antrobus, Brian Hicks and Don Jones, are individually liable for the wrongs complained of herein because they had direct involvement in the commission of these wrongs.

145.    John Kutzko and Linda Kutzko left the operation of Pagosa Specialty Pharmacy in approximately March of 2017.

146.    In approximately January or February of 2019, PagSprPharmLLC, Todd Antrobus and Brian Hicks defaulted on their note to the Lirots and PP&C.  Thereafter PagSprPharmLLC, Todd Antrobus and Brian Hicks abandoned further operation of Pagosa Specialty Pharmacy.

147.    For simplicity purposes, the sundry individuals and entities who operated or were responsible for the operation of Pagosa Specialty Pharmacy, including PP&C, Toby Lirot, Casey Lirot, John Kutzko, Linda Kutzko, Don Jones, Todd Antrobus, Wanda Antrobus, Brian Hicks, PagSprPharmLLC, will be referred to herein as the "Pagosa Specialty Pharmacy Defendants."

### B.  NHS Pharma Sales, Inc.

148.     On December 15, 2015, PP&C d/b/a Pagosa Specialty Pharmacy entered into an illegal Marketing Services Agreement ("MSA") with NHS Pharma Sales, Inc. ("NHS Sales"). This agreement was signed by Toby Lirot on behalf of Pagosa Specialty Pharmacy.

149.     NHS Sales and its related company, NHS Pharma, Inc. ("NHS Pharma"), are California corporations that currently maintain their principal place of business at 508 W. Mission Ave., Suite 202, Escondido CA 92025.

150.     At all times material hereto, the individuals primarily responsible for the day to day acts and omissions of NHS Sales and NHS Pharma have been Charles R. Green, Jr. ("Ron Green"), Melinda E. Green ("Melinda Green) and David P. Tenney ("Tenney").

151.     At all times material hereto, the corporate identity and distinction between NHS Sales and NHS Pharma was wholly disregarded so that their separate corporate entity status of each entity should be disregarded and the individuals responsible for their day to day operations should be held personally liable.

152.     At all times material hereto, NHS served as the alter ego of those individuals and entities responsible for its operation, including Ron Green, Melinda Green and David Tenney. Specifically, NHS was used by these individuals and entities as an instrumentality to perpetuate a fraud and its separate corporate existence should be pierced to prevent fraud or injustice.

153.     In addition, NHS Sales' separate corporate existence should be disregarded as it is now a suspended California corporation.

154.     In addition, Ron Green, Melinda Green and Tenney are individually liable for the wrongs complained of herein because they participated in these wrongs by direct involvement.

155.     Where appropriate, NHS Sales and NHS Pharma will be referred to herein collectively as "NHS."

156.     The December 15, 2015 MSA established an illegal marketing scheme whereby Pagosa Specialty Pharmacy was obligated to compensate NHS Sales as much as 70% net on all referred prescriptions.

157.     Pagosa Specialty Pharmacy's files contain a document from NHS Pharma titled "Script Processing Service Contract" that is signed by Ron Green but not by PP&C.  This document established an illegal kickback scheme whereby NHS Pharma charged PP&C "9% on the committed amount from the PBM."  The service NHS Pharma offered to provide in this script processing service contract was to process scripts so that PP&C would be able to receive payments from insurance companies.

158.     From the available Pagosa Specialty Pharmacy financial records, it is known that Pagosa Specialty Pharmacy made the following payments to NHS:

| Date | Payee | Amount |
|---|---|---|
| 2-9-16 | NHS Pharma Sales, Inc. | $21,516.03 |
| 2-9-16 | NHS Pharma, Inc. | $3,227.40 |
| 2-24-16 | NHS Pharma Sales | $38,187.84 |
| 2-24-16 | NHS Pharma Sales | $5,728.17 |
| 5-3-16 | NHS Pharma Inc. | $30,134.28 |
| 6-9-16 | NHS Pharma Sales | $22,770.26 |
| 6-9-16 | NHS Pharma Inc. | $3,415.53 |
| 6-17-16 | NHS Pharma Sales | $3,447.76 |
| 6-17-16 | NHS Pharma Inc. | $517.76 |
| 8-19-16 | NHS Pharma Inc. | $14,254.51 |
| 8-19-16 | NHS Pharma, Inc. | $3,954.27 |
| 9-15-16 | NHS Pharma, Inc. | $1,960.55 |
| 9-15-16 | NHS Pharma Sales, Inc. | $13,070.36 |
| 10-11-16 | NHS Pharma, Inc. | $21,480.33 |
| 10-25-16 | NHS Pharma, Inc. | $3,100.77 |
| 11-08-16 | NHS Pharma Sales | $9,977.50 |
| 11-08-16 | NHS Pharma, Inc. | $2,677.32 |
| 12-08-16 | NHS Pharma Sales, Inc. | $3,080.96 |
| 12-08-16 | NHS Pharma, Inc. | $870.40 |

| Total | | $203,372.00 |
|---|---|---|

159.     The NHS December 15, 2015 MSA and the Script Processing Service Contract are illegal marketing agreements.  They attempt to disguise the kickbacks the two NHS entities received for referring to Pagosa Specialty Pharmacy prescriptions that were paid by GHPs.

160.     The NHS kickback scheme originally intended to charge a relatively high commission on private insurance or non-GHP prescriptions (70%) and adding on a 9% charge with respect to all referred prescriptions including those paid in whole or in part by GHPs.

161.     The 9% charge established by the Scripts Processing Service Contract fails to meet the personal services and management contracts exception found at 42 C.F.R. § 1001.952(d), *inter alia*, as the compensation paid to NHS is determined by taking into account the volume or value of the referrals and/or business generated between the parties for which payment will be made in whole or in part by a GHP.

162.     The overall illegality of the arrangement between the two NHS entities and PP&C is further illustrated by the facts that NHS' marketers simultaneously generated private insurance and GHP prescription referrals for PP&C to fill and ship, NHS at times demanded a 60% commission on the GHP prescription referrals, and the 9% script processing charge was only applied to scripts NHS referred to PP&C.

163.     In other words, NHS Pharma did not provide the script processing services identified in the Script Processing Service Contract for scripts that were generated for PP&C from other sources.  The 9% charge was only charged with respect to NHS referred scripts, many of which were paid for by GHPs.

164.     The fact that the MSA was intended to be a misleading document that was designed to cover up an illegal kickback arrangement, is illustrated by observing that, on the one

hand, the MSA clearly states that NHS will provide marketing and advertising services "which do not involve any persons enrolled in Medicare, Medicaid or any other federally-funded health care programs," yet in practice, about half of the prescriptions NHS referred to Pagosa Specialty Pharmacy were paid in whole or part by a GHP.

165.    A spreadsheet in Pagosa Specialty Pharmacy's possession evidences that NHS referred 69 prescriptions to Pagosa Specialty Pharmacy during the time period of January 19, 2016 through February 12, 2016 with total sales of $63,646.61.

166.    A February 18, 2016 invoice from NHS Sales to Pagosa Specialty Pharmacy claims "Committed Scripts" totaling $63,646.61 and requested a 60% commission on those sales for a total charge of $38,187.84. No deduction was made in this NHS Sales invoice for any GHP oriented scripts. A NHS Pharma invoice to Pagosa Specialty Pharmacy of the same date claimed 9% on the entire $63,646.41 or a total charge of $5,728.17.

167.    Pagosa Specialty Pharmacy paid both NHS invoices on February 24, 2018 via one cashier's check from Toby Lirot made payable to NHS Pharma Sales in the amount of $38,187.84, and another cashier's check from Toby Lirot to NHS Pharma Sales in the amount of $5,728.17.

168.    A March 31, 2016 Excel sheet, titled "Third Party (NHS)" prepared by Don Jones, that was stored by Pagosa Specialty Pharmacy in its NHS computer file, evidences that between January 15, 2016 and March 30, 2016 Pagosa Specialty Pharmacy filled 138 NHS generated prescriptions, many of which were paid for by Tricare.

169.    For example, this Excel sheet evidences that:

      a.    On February 10, 2016, Pagosa Specialty Pharmacy filled a script for Patient A for which Tricare paid $1,080.88;

    b.   On February 10, 2016, Pagosa Specialty Pharmacy filled a script for Patient B for which Tricare paid $1,080.88;

    c.   On February 10, 2016, Pagosa Specialty Pharmacy filled a script for Patient C for which Tricare paid $1,080.88; and

    d.   On February 17, 2016, Pagosa Specialty Pharmacy filled a script for Patient D for which Tricare paid $1,233.68.

170.    A NHS generated spreadsheet representing the scripts NHS referred, that had committed dates between May 8, 2016 and May 13, 2016, evidences that NHS referred 18 scripts to PP&C.  Of these 18 scripts, 9 were paid for by Medicare or Medicaid.  The total value attributed to these 18 scripts was $12,882.34, broken down as $7,544.45 for "Commercial" and $5,337.89 for "Fed/State."  This document stated "Total Amount Due to NHS: $8,888.81" which is 69% of the total amount of $12,882.34. So NHS was claiming a 69% commission on the fed/state scripts.

171.    Another NHS generated spreadsheet representing scripts NHS referred to PP&C that had committed dates between May 16, 2016 and May 31, 2016, evidences that NHS referred 60 scripts.  Of those 60 scripts, 32 were paid for by either Medicare or Medicaid. The total value attributed to these scripts was $30,874.95, broken down as $16,213.08 "Commercial" and $14,661.87 "Fed/State."  The document identified "Processing and Reps: (69%): $21,303.72" identified a credit of $1,322.39 due Pagosa Specialty Pharmacy and then stated "Total Amount Due to NHS: $19,981.33."  The charge of $21,303.72 represented 69% of $30,874.95, so NHS was claiming a 69% commission on the fed/state scripts.

172.    The available documents from Pagosa Specialty Pharmacy's files evidence that upon the demand for payment by NHS of this $19,981.33, Pagosa Specialty Pharmacy negotiated

a lower rate and only paid 60% on the commercial scripts, or just $9,727.84 and only 9% on the fed/state claims or $2,778.74.

173.    In other words, for that bill NHS renegotiated its claims and agreed to only charge its processing fee of 9% on the fed/state scripts, and not on the commercial claims, and to only charge its marketing services commission of 60% on the commercial, or non GHP claims.

174.    The truth is that the parties were negotiating a package price that took into account the volume and value of the GHP paid scripts NHS had referred to Pagosa Specialty Pharmacy.  Subsequent transactions evidence the formula varied depending on the nature or circumstances of a group of scripts.

175.    For example, another NHS spreadsheet that itemizes scripts that had committed dates between June 2, 2016 and June 30, 2016 evidences that, for that time period, NHS referred to Pagosa Specialty Pharmacy 100 scripts with a total value of $56,236.98.  59 of these 100 scripts were paid for by either Medicare, Medicaid or Tricare.  The total value of the GHP based scripts was 61% of the total, or $34,453.04.  As opposed to the previous versions of similar spreadsheets, this one only demanded NHS be paid 60% of the value of the commercial scripts or $13,070.36 and 9% of all the scripts, both commercial and fed/state, for a processing charge of $6,061.33.

176.    Further negotiation between NHS and Pagosa Specialty Pharmacy then lowered the amount Pagosa Specialty Pharmacy paid for the processing charges. A subsequent spreadsheet evidences NHS agreed to only charge the 9% processing fee on the commercial scripts, so the original charge of $6,061.33 was lowered to $1,960.55.

177.    On September 15, 2016, Pagosa Specialty Pharmacy paid both claims, wiring NHS Pharma $1,960.55 and NHS Sales $13,070.36.

178.    But this resolution of the billing for the June scripts did not stop the negotiations between these parties. Another NHS spreadsheet representing the scripts that had committed dates between July 1, 2016 and July 29, 2016 evidences that, for that time period, NHS referred over one hundred scripts to Pagosa Specialty Pharmacy.  The total value of these scripts was $62,406.97.  $32.167.79 was attributed to commercial scripts. $30,239.18 was attributed to fed/state scripts.  In this spreadsheet, NHS claimed it was owed 60% of the commercial claims, or $19,300.67 and 9% of all the scripts or $5,616.63.   Accounting for a credit due Pagosa Specialty Pharmacy of $3,436.97, NHS claimed it was owed a total amount of $21,480.33.

179.    Pagosa Specialty Pharmacy paid this amount, $21,480.33, on October 11, 2016 by wiring the funds to NHS Pharma's account.

180.    The relationship between Pagosa Specialty Pharmacy and NHS continued through at least December of 2016. NHS is believed to have engaged in similar acts with other pharmacies throughout the country which illegal activities have continued until the present.

181.    NHS continues to maintain a website in which it advertises its marketing abilities to pharmacies:  http://www.nhspharma.com/ .  NHS's interaction with Pagosa Specialty Pharmacy is just one example of a nationwide fraudulent scheme NHS, and the individuals responsible for its acts and omissions, have engaged in since at least 2015 and that is continuing.

182.    To the extent any of the NHS referred scripts were generated by individuals NHS and/or Pagosa Specialty Pharmacy attempted to set up as W-2 employees, such employment relationships were a sham.

183.    For one, payments were made directly by Pagosa Specialty Pharmacy to NHS, and as an entity, NHS could never qualify as a bona fide employee per the provisions of 42 C.F.R. § 1001.952 or 26 U.S.C. § 3121(d)(2).

184.     Second, any individuals these defendants attempt to pass off as employees of Pagosa Specialty Pharmacy never engaged in a bona fide employment relationship with Pagosa Specialty Pharmacy.  Per the IRS guidelines: (1) from a behavioral perspective, Pagosa Specialty Pharmacy never controlled or had the right to control these individual's actions – the individuals were free from the control and direction of the performance of their work; (2) from a financial perspective, the business aspects of the job were not controlled by Pagosa Specialty Pharmacy; and/or (3) there were no written contracts of employment and/or there were no consistent wages or benefits as one would expect in an employment relationship.

185.     Furthermore, use of the IRS' 20 Factor Test for determining whether an individual is an independent contractor or an employee evidences that said individuals would never qualify as employees.  From use of this 20 Factor Test there literally was no indicia of an employment relationship.

186.     And, from a simple common law standpoint, Pagosa Specialty Pharmacy never had the right to control these individuals, or exercised the requisite level of control over these individuals, with respect to the specific details of results, and the means by which the results were accomplished.  Pagosa Specialty Pharmacy simply had no right to control the work performed by these individuals, particularly as to when and how it was completed.

187.     The evidence is abundant that these individuals independently obtained prescriptions, with no direction from, or control by, Pagosa Specialty Pharmacy.  These individuals sporadically obtained prescriptions and then referred these prescriptions to Pagosa Specialty Pharmacy for a percentage based commission.   Any efforts to claim they were bona fide employees is a sham.

188.    The scripts which NHS referred to Pagosa Specialty Pharmacy and other pharmacies nationwide violate the AKS because these pharmacies paid remuneration to NHS in return for NHS referring prescription drug patients to these pharmacies for the purpose of these pharmacies filling scripts that were paid in whole or in part by a GHP.

189.    Because the subsequent claims by these pharmacies, including Pagosa Specialty Pharmacy, to GHPs for reimbursement with respect to these referred claims resulted from illegal kickbacks, said claims were false for purposes of the FCA.

190.    The subsequent claims by these pharmacies, including Pagosa Specialty Pharmacy, to GHPs for reimbursement were also false because they arose from phony doctor-patient relationships, of which the NHS defendants and the participating pharmacies knew or should have known.  The illegal marketers employed a regular group of health care professionals, many of whom were not physicians, such as physician assistants or nurse practitioners, who had DEA authorization to write prescriptions.   Once the marketer had identified a given patient interested in acquiring the prescription drug(s), the marketer would have a pre-arranged health care professional talk with the patient with a pre-ordained mission of writing the prescription. In many cases, the health care professional would receive a kickback in the form of a commission for writing the prescription.

191.    In addition, the subsequent claims by these pharmacies, including Pagosa Specialty Pharmacy, to GHPs for reimbursement were also false because the intent of obtaining these particular prescriptions was to sell a given patient the most expensive form of a given drug(s) when less expensive forms of a given drug were available, or a less expensive substitute drug would have been appropriate to achieve the sought health remedy. By intentionally selling, or causing the sale of, the most expensive drug possible, the NHS defendants and the Pagosa

Specialty Pharmacy defendants, violated Tricare and Medicare's requirements to provide medically necessary drugs in the most economic form possible.

192.    The actions by the NHS defendants and the Pagosa Specialty Pharmacy defendants demonstrate a requisite degree of "knowledge" or scienter. In particular, the fact that the MSA attempts to claim no scripts will be referred with respect to individuals who are enrolled in a GHP, yet about half of the scripts which NHS referred were with respect to GHP beneficiaries demonstrates these defendants actually knew their actions violated the FCA, or had a reckless disregard or deliberate indifference with respect to whether their actions violated the FCA.

193.    In addition, the MSA specifically disavows the referral of any GHP based scripts, which demonstrates that the defendants understood the AKS, yet NHS consistently charged a percentage based commission on GHP based scripts.

194.    And, the NHS defendants' overall acts of charging a percentage commission to solicit and refer scripts to be filled by one or more pharmacies is such a clear violation of the AKS and the FCA that, at a minimum, a reckless disregard or deliberate indifference with respect to whether their actions violated the FCA is established.

195.    The falsity of these claims was material.  The government would not have paid these claims if it had known they were generated by an illegal kickback scheme; and the government has on repeated occasions prosecuted individuals and entities, both criminally and civilly, who have engaged in similar illegal prescription drug referral schemes.

196.    Furthermore, there is no contestable issue of materiality with regard to an AKS-based claim.  All claims resulting from AKS violations are "false or fraudulent" as a matter of law.

197.    The illegal activities involving the NHS defendants implicates all of the Pagosa Specialty Pharmacy defendants.  From the computer records in Relator Cusick's records, the illegal activities with the NHS defendants was ongoing as of December 2016 with no indication it was stopping.

**C.   The Pagosa Specialty Pharmacy defendants involvement in other schemes:**

198.    The NHS defendants are not the only individuals or entities with whom the Pagosa Specialty Pharmacy defendants engaged in illegal activities.   The available records evidence several, widespread schemes by the Pagosa Specialty Pharmacy defendants to engage in illegal marketing schemes to bill GHPs for prescription drugs during the time period of August 2014 until approximately February of 2019.  The following are several examples of other illegal schemes in which the Pagosa Specialty Pharmacy defendants participated:

**(1) Choice Medical Consultants:**

199.    For example, on April 1, 2016, Pagosa Specialty Pharmacy entered into a License Agreement with Choice Medical Consultants, LLC ("CMC").  Then, on May 23, 2016, PP&C entered into a consulting agreement with CMC. This document evidences that CMC agreed to "perform the services set forth herein" and that "All Employees of Firmare (sic)W-2 employees and are subject to all of the Companies HR policies and procedures." The introductory paragraph of this agreement designates CMC as "the Firm."

200.    The Schedule A to this agreement evidences that the services CMC agreed to provide was the referral of prescriptions.   Schedule A provides that CMC, the Firm, would earn a commission between 65.5% and 70% of the net profit "on adjudicated claims billed for new prescriptions and refills" depending on whether the claims were factored.

201.    The intent of this agreement was to establish an illegal GHP prescription referral arrangement whereby CMC would charge a specific percentage determined by taking into account the volume and/or value of GHP adjudicated prescriptions referred to Pagosa Specialty Pharmacy.

202.    Pagosa Specialty Pharmacy's available financial records evidence that it engaged in this illegal prescription referral arrangement with CMC through at least October, 2016, making the following payments to CMC:

| Date | Payee | Amount |
|---|---|---|
| 4-21-16 | Choice Medical Consultants, LLC | $2,418.57 |
| 6-9-16 | Choice Medical Consultants, LLC | $1,707.77 |
| 9-15-16 | Choice Medical Consultants, LLC | $2,391.00 |
| 9-15-16 | Choice Medical Consultants, LLC | $1,187.81 |
| 9-30-16 | Choice Medical Consultants, LLC | $4,585.00 |
| 9-30-16 | Choice Medical Consultants, LLC | $3,215.00 |
| 10-11-16 | Choice Medical Consultants, LLC | $933.53 |
| 10-27-16 | Choice Medical Consultants, LLC | $534.29 |
| **Total** | | **$16,972.97** |

**(2) Assured Medical Group, LLC:**

203.    In approximately June or July of 2016, Pagosa Specialty Pharmacy entered into an illegal prescription referral arrangement with Assured Medical Group, LLC ("AMG").

204.    Pagosa Specialty Pharmacy's available bank records evidence the following payments were made to AMG:

| Date | Payee | Amount |
|---|---|---|
| 8-19-16 | Assured Medical Group, LLC | $4,000.00 |
| 9-2-16 | Assured Medical Group LLC | $7,440.00 |
| 9-27-16 | Assured Medical Group LLC | $4,919.93 |
| 10-11-16 | Assured Medical Group LLC | $8,735.53 |
| 10-25-16 | Assured Medical Group LLC | $5,342.93 |
| 12-12-16 | Assured Medical Group LLC | $2,750.00 |
| **Total** | | **$33,188.39** |

205.     Invoices from AMG to Pagosa Specialty Pharmacy evidence the parties utilized phony invoices. For example, a July 1, 2016 invoice from AMG to Pagosa Specialty Pharmacy demanded payment in the amount of $4,000.00 for "Purchase of Leads Long form Inclusive recordings." Pagosa Specialty Pharmacy paid this invoice by wire transfer on August 19, 2016.

206.     Pagosa Specialty Pharmacy's internal records demonstrate AMG was actually billing for the illegal referral of prescriptions. One pdf document in Pagosa Specialty Pharmacy's "Assured Medical Group LLC" computer file is titled "Frank and Eric payment 9-1 to 9-15 2016." This document is a September 24, 2016 pdf spreadsheet evidencing 17 adjudicated prescriptions with a total net value of $11,039.85. This document evidences 50%, or $5,519.93, is owed to "Frank and Eric."

207.     Pagosa Specialty Pharmacy paid this amount owed to "Frank and Eric," on September 27, 2016 by paying $4,919.93 to Assured Medical Group LLC by wire transfer and paying an additional $600 in so called W-2 wages to Eric Goldberg.

208.     Another Pagosa Specialty Pharmacy record maintained in its "Assured Medical Group LLC" computer file is titled "wire 09_02_11_16_12" and is dated 9-2-16. This five page pdf document contains a two page spreadsheet in which the "Sales Person" is identified as "Medical Assured." This spreadsheet itemizes a series of prescriptions totaling $49,489.84, with a cost of $25,579.21. Another page of this five page pdf document contains a September 1, 2016 invoice from AMG in the amount of $7,440.00 for "Purchase of Leads Long form Inclusive recordings." Pagosa Specialty Pharmacy paid this invoice for $7,440.00 by wire transfer on September 2, 2016.

209.     Other spreadsheets in Pagosa Specialty Pharmacy's "Assured Medical Group LLC" computer file evidence that AMG was generating substantial prescription referrals. One

such spreadsheet covering the time period of September 16, 2106 through September 30, 2016 evidences the referral of 28 scripts with a total net value of $18,670.65. This spreadsheet evidences that 50% of $18,670.65, or $9,335.33, was owed to AMG.  Pagosa Specialty Pharmacy paid this amount to AMG on October 11, 2016 by wire transferring $8,735.33 to AMG and paying $600 in bogus W-2 wages to one of AMG's sales people.

210.    Another spreadsheet covering the time period October 3, 2016 through October 13, 2016 evidences that 19 scripts with a total net value of $10,685.85 were referred to Pagosa Specialty Pharmacy by Assured Medical. This spreadsheet evidences that 50% of $10,685.85, or $5,342.93, was owed to AMG. Pagosa Specialty Pharmacy paid this amount, $5,342.93, by wire transfer to AMG on October 25, 2016.

211.    It is also established by Pagosa Specialty Pharmacy's records that a portion of AMG's script referrals involved prescriptions that were paid in whole or in part by GHPs.  One Excel spreadsheet in Pagosa Specialty Pharmacy's computer files titled "Assured Medical 09.01.16 to 09.15.16" evidences several scripts in which Medical Assured was designated as the sales person and for which the primary insurer was Tricare:

    a.   On September 12, 2016 a script was filled for Tricare insured Patient E of Saint Petersburg Florida;

    b.   On September 6, 2016 a script was filled for Tricare insured Patient F of Charleston, IN; and

    c.   On September 13, 2016, two scripts were filled for Tricare insured Patient G of Charleston, IN.

**(3) AP Global Pro Inc.:**

212.     In approximately August of 2016, Pagosa Specialty Pharmacy entered into an illegal marketing relationship with AP Global Pro, Inc. ("APG").

213.     APG is a Florida corporation that was incorporated on June 23, 2016 by Weiss Law Group, PA ("WLG") and shares the same principal business address as this law firm: 5531 N. University Drive, Suite 103, Coral Springs, FL 33067.

214.     Pagosa Specialty Pharmacy was instructed to make payments to APG via wire transfer to WLG.  Pagosa Specialty Pharmacy's available records evidence that from August 2016 through October of 2016, Pagosa Specialty Pharmacy made payments for APG's marketing services directly to WLG in the amount of $64,347.43, specified as follows:

| Date | Payee | Amount |
|---|---|---|
| 8-16-16 | Weiss Law Group | $20,304.21 |
| 9-1-16 | Weiss Law Group | $10,973.63 |
| 9-9-16 | Weiss Law Group | $11,043.40 |
| 9-26-16 | Weiss Law Group | $12,930.96 |
| 10-12-16 | Weiss Law Group | $6,819.33 |
| 10-25-16 | Weiss Law Group | $2,275.90 |
| **Total** | | **$64,347.43** |

215.     APG used phony invoices to disguise that it was requesting payment for illegal marketing and referral services. For example, the invoice APG sent on August 12, 2016, invoice #1026, requested payment for "Call Center Pro-July 1-July 31," "VOIP Service," and "CRM-Software."  This invoice requested payment in the amount of $20,304.21.  Pagosa Specialty Pharmacy paid that amount, $20,304.21, to WLG on August 16, 2016 via wire transfer.

216.     A corresponding APG spreadsheet dated August 12, 2016, however, evidences APG was referring prescriptions to Pagosa Specialty Pharmacy, not providing call center

services, software or VOIP services.  This APG spreadsheet details 29 prescriptions that APG referred to Pagosa Specialty Pharmacy, with a total net value of $41,018.60.

217.     Similarly, a September 7, 2016 APG invoice, #1033, demanded payment in the amount of $11,043.40 for "Call Center Pro (Customer Service- Aug26-Aug31," Software Fees," and VOIP Telecom."  Pagosa Specialty Pharmacy paid this amount, $11,043.40, to WLG via wire transfer on September 9, 2016.

218.     However, other records Pagosa Specialty Pharmacy maintained in its computer evidence that its payments to WLG were not for call center services, software fees or VOIP telecom, but were for the illegal referral of prescriptions.

219.     For example, one Pagosa Specialty Pharmacy document titled "wire detail 2016_09_01_15_22_11" evidences 50 scripts APG referred to Pagosa Specialty Pharmacy that were filled between 8-4-16 and 8-26-16 with a total net value of $31,989.30.  APG claimed a commission of 55% or $17,594.12 on these referred prescriptions.  Allowing for credit to Pagosa Specialty Pharmacy of $6,620.51, APG claimed it was owed $10,973.61.  Pagosa Specialty Pharmacy paid this amount, $10,973.61, to WLG via wire transfer on September 1, 2016.

220.     Another spreadsheet stored on September 24, 2016, in Pagosa Specialty Pharmacy's computer's "AP Global" file, titled "AP Global 2016_09_24_09_46_50," evidences 27 scripts APG referred to Pagosa Specialty Pharmacy that were filled between 9-1-16 and 9-15-16.  These 27 scripts had a total net value of $24,601.75.  APG demanded a 55% commission on these 27 referred scripts, or $13,530.96.  In a handwritten notation on this spreadsheet, Pagosa Specialty Pharmacy wrote "13,530.96- 600.00 W-2 $12,930.96," evidencing that Pagosa Specialty Pharmacy was deducting $600 in phony W-2 wages from APG's claim leaving a

balance due of $12,930.96.  Pagosa Specialty Pharmacy paid this amount, $12,930.96, via wire transfer to WLG on 9-26-16.

221.    The available records evidence that most of the scripts APG referred to Pagosa Specialty Pharmacy were paid for by GHPs.

222.    For example, the APG spreadsheet dated August 12, 2016 that is discussed above itemized 29 prescriptions.  Of those 29 prescriptions, Tricare was the insurer for 24 of them.

223.    Another Pagosa Specialty Pharmacy Excel spreadsheet titled "08.20.16 to 8.26.16 Third Party Claims," that was created by Don Jones on 9-6-16, provides significant detail for 40 scripts.  One column on this Excel sheet identifies the insurance and another identifies the sales person.  Of the 40 scripts, APG was listed as the sales person for 17 of the scripts.  Of those 17 APG scripts, 13 were paid by Tricare.

224.    On August 29, 2016 Don Jones created an Excel spreadsheet titled "Year to Date Rep Group Data."  This Excel sheet provides substantial detail regarding 1311 prescriptions generated by marketers.  Of those 1311 scripts, 113 were attributed to APG as the sales person.  Of those 113 APG generated scripts, 72 were paid by Tricare.

225.    Another Excel sheet created by Don Jones on August 29, 2016, titled "2016 Marketing Rep Commissions – Year to Date Rep Group Data" similarly itemizes 553 prescriptions.   Of those 553 scripts, 70 were attributed to APG as the sales person.  Of those 70 APG generated scripts, 57 were paid by Tricare.

**(4) Optimum Pharmacy Services, LLC**

226.    Optimum Pharmacy Services, LLC ("OPS") is either a registered limited liability company of unknown origin or it is an unincorporated association.

227.     At all times material hereto, OPS maintained its principal place of business at 115 Mill Street, Olive Hill Kentucky.

228.     In 2016, Pagosa Specialty Pharmacy entered into an agreement with OPS to use OPS's service to create prescriptions and refer them to Pagosa Specialty Pharmacy for fulfillment, in exchange for Pagosa Specialty Pharmacy paying OPS a commission.

229.     OPS used a process it called "data mining." The essential concept was that OPS would review information regarding Pagosa Specialty Pharmacy's existing pharmacy clients and determine a method to create new and more lucrative prescriptions for those patients.

230.     The method involved OPS reviewing existing patients and prescriptions, determining more expensive drugs which could replace an existing prescription and then performing a test bill to the patient's insurance company, without the patient's permission, to see if that test bill would get paid.

231.     Once OPS found a successful combination of a more expensive drug and an insurance company that would pay for this more expensive drug, it would contact the patient's practitioner and subtly cause that professional to prescribe the new drug.

232.     In December of 2016, Todd Antrobus and his group had taken over the management of Pagosa Specialty Pharmacy.  In an effort to recruit Relator Cusick to participate in mining Pagosa Specialty Pharmacy's data, Todd Antrobus and Drew Hicks sent Cusick several emails about how this work could be done:

　　　　a.   On December 8, 2016 at 9:13 am, Todd Antrobus sent Cusick an email that attached an Excel sheet labeled "Retail Report 11.01.16 to 11.30.16."  This retail report identified 777 patients and provided detailed information regarding each patient's last prescription.

b.  At 9:44 a.m. on December 8, 2016, Todd Antrobus sent a second email to Cusick that contained an attachment labeled "Mebolic Information Sheet." The sheet extolled the virtues of a prescription vitamin Todd Antrobus was trying to push that cost $1,749.00 per prescription.

c.  At 9:48 a.m. on December 8, 2016, Todd Antrobus sent a third email to Cusick that contained an updated retail report.  This report contained a new tab for "Metabolic Fit."

d.  At 10:05 a.m. on December 8, 2016, Todd Antrobus sent Cusick a fourth email that contained an Excel sheet with the title "TPS Product."  Within the body of this email, Antrobus commented that he needed to get Cusick a list of which drugs were working best so far – and that what drug might not work for one insurance company might work for another.  The Excel sheet identified a number of common drugs being pushed for sale and identified the difference in pharmacy cost and reimbursement rates.  The information in this Excel sheet would allow a pharmacy to determine the most profitable drug to sell to a given patient.

e.  At 4:14 p.m. on December 8, 2016, Todd Antrobus sent Cusick a fifth email that contained an Excel Sheet titled "Pagosa Springs Potential Opportunities 11.1.16-11.30.16."  Antrobus indicated Drew wanted him to send this sheet to Cusick. The Excel sheet contained a list of 173 patients and their recent prescriptions.  Contained within this email chain is the email from Drew Hicks to Antrobus in which Hicks comments that he "[c]iphered through the list of RX's you sent from Pagosa for last month. These are all areas for

opportunities."  And below that comment Hicks provided a list of types of

drugs and the more profitable drugs that could be substituted for the patient's

current drug.  For example, for individuals currently taking topical

corticosteroids, Hicks suggested they could substitute Fluocinonide or

Diflorasone.

f.   On December 10, 2016, Todd Antrobus sent a sixth email to Cusick that

attached an Excel sheet labeled "Compounds vs. Legends Drugs 11.01.16 to

11.30.16."  This Excel sheet contains detailed information regarding 330

prescriptions Pagosa Specialty Pharmacy filled in November of 2016.

g.   On January 10, 2017, Drew Hicks sent Cusick an email that attached 17

pages. Each page identified a patient, the prescriber and then identified the

type of medications that could be sold to a given patient. Within the body of

the email, Drew Hicks said: "Here are the Rx's I test billed last month.  Let

me know which Prescribers/Patients you're comfortable with and I can call to

try and get the Rx signed/approved or you can if you have the time. Some big

money here to be made.  Let me know how I can help."

233.   Notwithstanding the OPS defendants' efforts to recruit Cusick, he never

participated in OPS' scheme, either while working at Pagosa Specialty Pharmacy or as the owner

of the Bayfield Pharmacy.

234.   In essence, what OPS was doing was preying on the patients of a given pharmacy,

using questionable means to identify a more expensive drug that could be sold a given patient,

test billing the patient's insurance company without the patient's permission, then causing the

patient's physician to prescribe the new medication.  Once this process was complete, OPS

would refer the prescription to the pharmacy in consideration for a 50% commission on the net revenue generated by the new prescription.

235.    At all times material hereto, OPS performed this data mining for Pagosa Specialty Pharmacy and referred new prescriptions to Pagosa Specialty Pharmacy for fulfillment.

236.    At all times material hereto, OPS generated new prescriptions for Pagosa Specialty Pharmacy using this data mining scheme that were paid for in whole or in part by GHPs.

237.    On one or more occasions, John Kutzko admitted to Relator Cusick that Pagosa Specialty Pharmacy was using OPS's data mining services and that this service was referring new scripts that were paid for in whole or in part by GHPs.

238.    Relator Cusick was also told by Drew Hicks that OPS was engaging in this scheme with numerous other pharmacies around the country.  To make this point, Drew Hick sent Cusick an email which demonstrated that OPS had remote access to six other pharmacies.

**D.  Pagosa Specialty Pharmacy's independent use of sham W-2 employees:**

239.    At all times material hereto, Pagosa Specialty Pharmacy independently engaged individuals to market prescriptions on their behalf and illegally paid those individuals kickbacks in the form of commissions on the prescriptions they generated for Pagosa Specialty Pharmacy to fill.

240.    Many of the prescriptions these individuals generated were paid for in whole or in part by GHPs.

241.    Any such individuals Pagosa Specialty Pharmacy attempts to pass off as employees never engaged in a bona fide employment relationship.

242.    Per the IRS guidelines: (1) from a behavioral perspective, Pagosa Specialty Pharmacy never controlled or had the right to control these individual's actions – the individuals were free from these defendants' control and direction in the performance of their work; (2) from a financial perspective, the business aspects of the job were not controlled by these defendants; and/or (3) there were no written contracts of employment and/or there were no consistent wages or benefits as one would expect in an employment relationship.

243.    Furthermore, use of the IRS' 20 Factor Test for determining whether an individual is an independent contractor or an employee evidences that said individuals would never qualify as employees.  From use of this 20 Factor Test there literally was no indicia of an employment relationship.

244.    And, from a simple common law standpoint, with respect to the specific details of the job results, and the means by which the job results were accomplished, Pagosa Specialty Pharmacy never had the right to control these individuals, or exercised any level of control over these individuals.

245.    The evidence is abundant that these individuals independently obtained prescriptions, with no direction from, or control by, Pagosa Specialty Pharmacy.  These individuals sporadically obtained prescriptions and then referred these prescriptions to Pagosa Specialty Pharmacy for a percentage based commission.   Any efforts to claim they were bona fide employees is a sham.

246.    One of these sham W-2 employees was Jimmy Vreeland, who began receiving commissions from Pagosa Specialty Pharmacy for sales commencing in November of 2015.

247.    Over time, Pagosa Specialty Pharmacy's records evidence the following payments were made to Jimmy Vreeland:

| Date Range | Commission | Insurance Pay | Cost of Goods | Payout |
|---|---|---|---|---|
| 11/1/15 to 11/30/15 | 35% | $11,020.93 | $6,620.49 | $1,540.15 |
| 12/1/15 to 12/31/15 | 35% | $13,733.02 | $9,200.27 | $1,586.46 |
| 2/1/16 to 2/15/16 | 35% | $3,759.47 | $2,814.51 | $330.74 |
| 2/16/16 to 2/29/16 | 35% | $4,069.72 | $1,638.34 | $850.98 |
| 3/1/16 to 3/15/16 | 35% | $10,160.12 | $5,208.14 | $1,733.19 |
| 5/29/16 to 6/11/16 | 35% | $425.80 | $374.45 | $17.97 |

248.     Review of Pagosa Specialty Pharmacy's available payroll records evidence that Jimmy Vreeland was never on its payroll and hence, he was never paid any regular wages; he was only paid commissions.

249.     Similarly, with reference to the Excel sheet Don Jones created on August 29, 2016 titled "Year to Date Rep Group Data_jdk_09282016" it is clear that as of 9/27/16 Jimmy Vreeland had never been paid any W-2 wages, even though as evidenced by the table above he had been paid commissions in 2016.

250.     And, with reference to that same Excel sheet, it is clear that Jimmy Vreeland was the sales person for 20 prescriptions that were paid for by Tricare.

251.     The scripts for which Pagosa Specialty Pharmacy paid these sham W-2 employees a commission violate the AKS because these pharmacies paid remuneration to these sham W-2 employee in return for them referring prescription drug patients to these pharmacies for the purpose of these pharmacies filling scripts that were paid in whole or in part by a GHP.

252.     Because the subsequent claims by the Pagosa Specialty Pharmacy defendants to GHPs for reimbursement with respect to these referred claims resulted from illegal kickbacks, said claims were false for purposes of the FCA.

253.     The subsequent claims by the Pagosa Specialty Pharmacy defendants to GHPs for reimbursement were also false because they arose from phony doctor-patient relationships, of which the Pagosa Specialty Pharmacy defendants knew or should have known.  The illegal marketers employed a regular group of health care professionals, many of whom were not physicians, such as physician assistants or nurse practitioners, who had DEA authorization to write prescriptions.   Once the marketer had a given patient interested in acquiring the prescription drug(s), the marketer would have a pre-arranged health care professional talk with the patient with a pre-ordained mission of writing the prescription. In many cases, the health care professional would receive a kickback in the form of a commission for writing the prescription.

254.     In addition, the subsequent claims by the Pagosa Specialty Pharmacy defendants to GHPs for reimbursement were also false because the intent of obtaining these particular prescriptions was to sell a given patient the most expensive form of a given drug(s) when less expensive forms of a given drug were available, or a less expensive substitute drug would have been appropriate to achieve the sought health remedy. By intentionally selling the most expensive drug possible, the defendants violated Tricare and Medicare's requirements to provide medically necessary drugs in the most economic form possible.

255.     The actions by the Pagosa Specialty Pharmacy defendants demonstrate a requisite degree of "knowledge" or scienter. The defendants' overall acts of paying a percentage commission to obtain scripts is such a clear violation of the AKS and the FCA that, at a minimum, a reckless disregard or deliberate indifference with respect to whether their actions violated the FCA is established.

256.     The falsity of these claims was material.  The government would not have paid these claims if it had known they were generated by an illegal kickback scheme; and the

government has repeatedly prosecuted individuals and entities, both criminally and civilly, who have engaged in similar illegal prescription drug referral schemes. There is no contestable issue of materiality with regard to an AKS-based claim. All claims resulting from AKS violations are "false or fraudulent" as a matter of law.

## IX.   FIRST CLAIM FOR RELIEF – FCA LIABILITY, 31 U.S.C. § 3729(a)(1)(A)-(B), (G)
### (Pagosa Specialty Pharmacy Defendants)

257.   The Relator incorporates by reference the prior allegations of this Amended Complaint, as though more fully set forth herein.

258.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729-3733 ("FCA").

259.   This claim for relief addresses the liability of those entities and individuals who were responsible for the operation of the pharmacy located at 426 Pagosa Street, Pagosa Springs, Colorado that operated under the tradename "Pagosa Specialty Pharmacy."

260.   Those entities and individuals will be referred to herein as the "Pagosa Specialty Pharmacy Defendants."

261.   The Pagosa Specialty Pharmacy Defendants include John Kutzko, Linda Kutzko, Don Jones, PP&C, Toby Lirot, Casey Lirot, PagSprPharmLLC, Todd Antrobus, Wanda Antrobus and Brian Hicks.

262.   The relative dates when each of these entities and/or individuals were responsible for the acts and omissions of Pagosa Specialty Pharmacy is specified above in ¶ ¶ 120-146.

263.   On or about August 2014 and continuing until approximately February 2019, the Pagosa Specialty Pharmacy Defendants knowingly and willfully solicited, offered and paid remuneration directly or indirectly, overtly or covertly, in cash or in kind to induce others to market, sell and then refer to Pagosa Specialty Pharmacy prescriptions for drugs understanding

that payment for these prescriptions would be made in whole or in part by one or more GHP including the Medicare, Medicaid or Tricare programs.

264.    Subsequent to receipt of these illegally obtained prescriptions, the Pagosa Specialty Pharmacy Defendants filled, or caused to be filled, these prescriptions and then presented, or caused to be presented, claims to the applicable GHP, including Medicare, Medicaid and TRICARE for reimbursement.

265.    The Pagosa Specialty Pharmacy Defendants were then paid by the applicable GHP with respect to these false claims they submitted, or caused to be submitted, with respect to these illegal prescriptions.

266.    By soliciting and then paying remuneration to others to market, sell and then refer prescriptions to Pagosa Specialty Pharmacy, the Pagosa Specialty Pharmacy Defendants violated the AKS.

267.    Because the Pagosa Specialty Pharmacy Defendants' actions were in violation of the AKS, all claims submitted to GHPs that were in violation of the AKS were false claims per the FCA. Patient Protection and Affordable Care Act of 2010, Pub.L. No. 111–148, 124 Stat. 119, codified at 42 U.S.C.§ 1320a–7b(g).

268.    In addition, the claims for reimbursement for filling prescriptions the Pagosa Specialty Pharmacy Defendants submitted, or caused to be submitted, to one or more GHPs were also false because the prescriptions arose from a patient-practitioner relationship that the Pagosa Specialty Pharmacy Defendants knew or should have known was not valid.

269.    Said claims for reimbursement for filling prescriptions the Pagosa Specialty Pharmacy Defendants submitted, or caused to be submitted, to one or more GHPs were also false because the Pagosa Specialty Pharmacy Defendants knowingly caused others to market and/or

sell, and then refer for filling prescriptions for drugs that were intentionally the highest priced drugs the Pagosa Specialty Pharmacy Defendants could sell and refill when less expensive forms of a given drug or other drugs were available and appropriate.

270.    The submission of these false claims to one or more GHP was knowingly false as, *inter alia*, the Pagosa Specialty Pharmacy Defendants "knowingly" violated the AKS, "knowingly" participated in a scheme that employed invalid patient-practitioner relationships, and/or "knowingly" sold the most expensive forms of a given drug when less expensive forms of that drug or other drugs were available and appropriate.

271.    The Pagosa Specialty Pharmacy Defendants' acts and omissions were material as defined by the FCA.

272.    By virtue of the acts described above, the Pagosa Specialty Pharmacy Defendants knowingly caused false claims for payment or approval to be presented to the United States in violation of 31 U.S.C. § 3729(a)(1)(A), as amended May 20, 2009, when they submitted or caused the submission of these false claims to one or more GHP, including Medicare, Medicaid and Tricare.

273.    By virtue of the acts described above, the Pagosa Specialty Pharmacy Defendants knowingly made or used, or caused to be made or used, false records or statements to get the United States to pay or approve false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

274.    By virtue of the acts described above, the Pagosa Specialty Pharmacy Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government, in violation of 31 U.S.C. § 3729(a)(1)(G) by failing to refund the fraudulently obtained GHP payments they received.

275.    Relators cannot now identify all of the false claims for payment that the Pagosa Specialty Pharmacy Defendants presented or caused to be presented, or the false records or statements the Pagosa Specialty Pharmacy Defendants made or used, or caused to be made or used, in support of such claims because Relators do not have access to all of the records in the Pagosa Specialty Pharmacy Defendants' or third parties' possession.

276.    The United States, unaware of the falsity of the records, statements, and claims that the Pagosa Specialty Pharmacy Defendants made or caused to be made, paid claims that would not be paid but for the Pagosa Specialty Pharmacy Defendants' illegal conduct.

277.    At all times material hereto, the Pagosa Specialty Pharmacy entity defendants acted by and through their officers, directors, employees and/or agents and are, therefore, vicariously responsible for the actions of said officers, directors, employees and/or agents.

278.    The United States, unaware that the Pagosa Specialty Pharmacy Defendants were knowingly concealing and/or knowingly seeking to avoid or decrease their obligation to pay or transmit money or property to the government, did not collect from the Pagosa Specialty Pharmacy Defendants monies that it would have collected but for the Pagosa Specialty Pharmacy Defendants' unlawful conduct.

279.    Defendants have damaged, and continue to damage, the United States in a substantial amount to be determined at trial.

280.    Additionally, the United States is entitled to treble damages and to the maximum penalty under 31 U.S.C. §3729, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every violation alleged herein.

## X. SECOND CLAIM FOR RELIEF–
### FCA LIABILITY, 31 U.S.C. § 3729(a)(1)(A)-(B), (G)
#### (NHS Defendants)

281.    The Relator incorporates by reference the prior allegations of this Amended

Complaint, as though more fully set forth herein.

282.    This is a claim for treble damages and penalties under the False Claims Act, 31

U.S.C. § 3729-3733 ("FCA").

283.    This claim for relief addresses the liability of those entities and/or individuals who

were responsible for the operation of the NHS entities.

284.    Those entities and individuals will be referred to herein as the "NHS Defendants."

285.    The NHS Defendants include NHS Sales, NHS Pharma, Ron Green, Melinda

Green and David Tenney.

286.    From at least December 2015 and continuing until the present, the NHS

Defendants knowingly and willfully solicited and received remuneration in the form of payments

and commissions directly or indirectly, overtly or covertly, in cash or in kind in return for

marketing prescription drugs, selling the prescription drugs, referring the prescriptions to a given

pharmacy, and then submitting the claims for reimbursement for the prescription when it was

understood that  payment for said prescription was to be made in whole or in part by one or more

GHP including the Medicare, Medicaid or Tricare programs.

287.    The NHS Defendants have engaged, and continue to engage, in a nationwide

scheme to violate the AKS and the FCA by so marketing prescription drugs, selling the

prescription drugs, referring the prescriptions to a given pharmacy, and then submitting the

claims for reimbursement on behalf of a given pharmacy when it was understood that payment

for said referred prescriptions was to be made in whole or in part by one or more GHP including the Medicare, Medicaid or Tricare programs.

288.     By soliciting and then receiving remuneration from others to market, sell, refer prescriptions to numerous pharmacies throughout the United States, including the Pagosa Specialty Pharmacy and then submit the claim for reimbursement to a given GHP, the NHS Defendants violated the AKS.

289.     The NHS Defendants knew that when they marketed, sold and referred a given prescription to a given pharmacy, on behalf of a patient insured by a GHP, that said pharmacy would fill the prescription and then present to the applicable GHP a claim for payment that was tainted by the NHS Defendants' violation of the AKS.

290.     Because the NHS Defendants' actions were in violation of the AKS, all claims that the NHS Defendants submitted or caused to be submitted to GHPs that were tainted by the NHS Defendants' violation of the AKS were false claims per the FCA. Patient Protection and Affordable Care Act of 2010, Pub.L. No. 111–148, 124 Stat. 119, codified at 42 U.S.C.§ 1320a–7b(g).

291.     In addition, the claims for reimbursement for filling these prescriptions that the NHS  Defendants submitted or caused to be submitted to one or more GHPs, were also false because the prescriptions arose from a patient-practitioner relationship that the NHS Defendants knew or should have known was not valid.

292.     Said claims for reimbursement for filling prescriptions the NHS Defendants submitted or caused to be submitted to one or more GHPs, were also false because the NHS Defendants knowingly marketed and/or sold and then referred for filling prescriptions for drugs

that were intentionally the highest priced drugs the NHS Defendants could sell and refill when less expensive forms of a given drug or other drugs were available and appropriate.

293.    The NHS Defendants' actions were knowingly false as, *inter alia*, the NHS Defendants "knowingly" violated the AKS, "knowingly" participated in a scheme that employed invalid patient-practitioner relationships, and/or "knowingly" sold the most expensive forms of a given drug when less expensive forms of that drug or other drugs were available and appropriate.

294.    The NHS Defendants' acts and omissions were material.

295.    By virtue of the acts described above, the NHS Defendants knowingly caused false claims for payment or approval to be presented to the United States in violation of 31 U.S.C. § 3729(a)(1)(A), as amended May 20, 2009, when they caused the submission of these false claims to one or more GHP, including Medicare, Medicaid and Tricare.

296.    By virtue of the acts described above, the NHS Defendants knowingly made or used, or caused to be made or used, false records or statements to get the United States to pay or approve false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

297.    By virtue of the acts described above, the NHS Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government, in violation of 31 U.S.C. § 3729(a)(1)(G) by failing to refund the fraudulently obtained GHP payments they received.

298.    Relators cannot now identify all of the false claims for payment that the NHS Defendants presented or caused to be presented, or the false records or statements the NHS Defendants made or used, or caused to be made or used, in support of such claims because Relators do not have access to all of the records in the NHS Defendants' or third parties' possession.

299.     The United States, unaware of the falsity of the records, statements, and claims that the NHS Defendants made or caused to be made, paid claims that would not be paid but for the NHS Defendants' illegal conduct.

300.     At all times material hereto, the NHS entity defendants acted by and through their officers, directors, employees and/or agents and are, therefore, vicariously responsible for the actions of said officers, directors, employees and/or agents.

301.     The United States, unaware that the NHS Defendants were knowingly concealing and/or knowingly seeking to avoid or decrease their obligation to pay or transmit money or property to the government, did not collect from the NHS Defendants monies that it would have collected but for the NHS Defendants' unlawful conduct.

302.     Defendants have damaged, and continue to damage, the United States in a substantial amount to be determined at trial.

303.     Additionally, the United States is entitled to treble damages and to the maximum penalty under 31 U.S.C. §3729, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every violation alleged herein.

## XI.     PRAYER FOR RELIEF

WHEREFORE, the Relator, William Cusick, on behalf of the United States, requests: (a) that the United States Government recover from the Defendants all sums which it improvidently paid from federal GHPs, including the Medicare, Medicaid or Tricare federal programs, as a result of the Defendants' actions, including interest thereon; (b) that the damages described in (a) be trebled as provided in 31 U.S.C. § 3729(a); (c) that the maximum civil penalty be assessed against the Defendants for each false claim, record or statement submitted directly or indirectly to the Government as a result of their wrongful actions; (d) that the Court award the Relator all

amounts as are permitted under 31 U.S.C. § 3730(d), including an appropriate share of any sums recovered and benefits obtained in this action, now or in the future, along with the Relator's reasonable expenses, attorney fees, and costs incurred herein; (e) that the Court award pre-judgment interest on all amounts owed; and (f) that the Court grant any additional appropriate relief with respect to this *qui tam* action.

**THE RELATOR DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted this Tuesday, September 28, 2021.

THE LAW FIRM OF MICHAEL S. PORTER LLC

By:     s/ Michael S. Porter
         Michael S. Porter, Esq.
         4350 Wadsworth Blvd., Suite 300
         Wheat Ridge, CO  80033
         Telephone:  (303) 940-8370
         Fax:    (720) 512-4918
         E-mail: porterlaw@comcast.net

**ATTORNEY FOR THE RELATOR
WILLIAM CUSICK**

Relator's address:
695 Harvard Avenue
Pagosa Springs, CO 81147